[No. 6891-5-II.   Division Two.   April 23, 1985.]

*In the Matter of the Estate of*
E. J. MELL.

*Stephen J. Bean,* for appellants Lois Meyer and Maureen Page.

*Jerome L. Buzzard,* for appellants James Page, et al.

*E. Robert Fristoe,* for respondent Arthur Mell.

REED, J.—The residuary legatees of decedent E. J. Mell appeal from the trial court's distribution of the entire estate to decedent's son Arthur J. Mell. The issue is whether the trial court erred in concluding that the will was unambiguous, that extrinsic evidence of the testator's intent could not therefore be considered, and in decreeing distribution of the entire estate to Arthur J. Mell, leaving nothing for the residuary legatees. We answer in the affirmative and reverse.

Decedent, E. J. Mell, executed a last will and testament on December 12, 1970. At that time he was married to Mary A. Mell. Mary A. Mell had two children from a prior marriage: John H. Page and Lois Meyer. Decedent had one child from a prior marriage: Arthur J. Mell. Mary A. Mell died on October 31, 1971. Decedent did not remarry nor did he make a new will before his death nearly 11 years later on January 9, 1982. On the date of decedent's death, Arthur J. Mell had four children, John H. Page had six children, and Lois Meyer had four children.

Decedent's will provides in relevant part as follows:

SECOND: I declare that I am married, that my wife is MARY A. MELL, and that my wife and I have no children but that I have one son by a previous marriage, namely, ARTHUR J. MELL, who is of legal age. I declare that I have no children of any deceased child of mine. *Prior to my marriage to my present wife I had acquired separate property, and since our marriage my said wife and I have acquired community property. I intend by this will to dispose of my separate property and of my one–half*

*of the community property owned by myself and my said wife.*

THIRD: I will, devise and bequeath to my son, ARTHUR J. MELL, *all of the separate property owned by me at the time of my death,* both real and personal, and wherever situate, absolutely to do with and dispose of as he may deem fit.

FOURTH: All of the rest, residue and remainder of the estate of which I die seized and possessed, both real and personal, and wherever situate, I will, devise and bequeath to the then living children of my son, ARTHUR J. MELL; of my stepson, JOHN H. PAGE; and of my stepdaughter, LOIS MEYER, share and share alike.

(Italics ours.)

Because of the uncertainty created by these provisions, Arthur J. Mell, as executor, sought an order declaring the status of the property and determining rights under the will. Former RCW 7.24.040. The Page and Meyer step-grandchildren both entered separate appearances and the matter proceeded to a bench trial.

During trial, the Page and Meyer contingents were permitted to introduce extrinsic evidence of E. J. Mell's intent. This consisted of documents from Mary Mell's probate file wherein E. J. Mell, as executor and surviving spouse, insisted upon a clear segregation of his "separate property" from that to be included for estate purposes. In addition, Carol Page testified that from 1973 onward she acted as E. J. Mell's secretary and was familiar with his property holdings. She stated that, after Mary Mell's death, E. J. Mell made gifts to Arthur J. Mell of approximately 100 percent of the property inventoried in the Mary Mell estate as E. J. Mell's "separate property." Also, that in late 1981, after executing a gift deed to Arthur, E. J. Mell told Mrs. Page, "That's all, no more." "The 29 acres I gave him last night, that's all. Isn't that enough." "I've given him two businesses, the land, the buildings." "If he can't do it now, that's it. It's time for the rest."

Further, the will's scrivener, Ernest Meyer, a respected attorney of long standing, testified by deposition as follows:

Q. Do you know what assets he intended the step–children and grandchildren to receive?

A. No, other than what the will says.

Q. Do you know who he intended to be the prime beneficiary under his will?

A. Well, if he had died the day after his will was made, his son would have received his separate property and his grandchildren and step–children would have received the residue of his estate.

Attorney Meyer also testified that, shortly before his death, E. J. Mell told Meyer he intended to make a new will, the terms of which he was not prepared to discuss as yet.

Although the trial court admitted all of the foregoing evidence, it finally determined that it should not be considered because the will was unambiguous. Nevertheless, in arriving at its final conclusion respecting the testator's intent, the court specifically resorted to several rules of construction, including the presumption that E. J. Mell knew the law and was thus aware that, after Mary's death, E. J. Mell would own all of the property as his "separate property." Believing that the latter proposition was true, the court concluded that all of the property should go to Arthur, with none to the residuary legatees. The residuary legatees appeal.

The Page stepgrandchildren argue that the will contains both patent and latent ambiguities, that the extrinsic evidence should have been considered, and that application of appropriate rules of construction would result in residuary assets. The Meyer stepgrandchildren do not contend that an ambiguity arises from the four corners of the will, but that the court's reliance on a technical definition of "separate property" defeats the testator's intent and renders the residuary clause meaningless. Arthur J. Mell argues that no ambiguity exists to warrant the consideration of extrinsic evidence; that, as a matter of law, upon his wife's death E. J. Mell's one–half share of the community property became his "separate property" and remained unchanged at his death. Further, that the testator is presumed to know the legal significance of the words in his will and thus intended

that such "separate property" go to Arthur J. Mell.

When called upon to construe a will, the paramount duty of the court is to deduce and give effect to the testator's intent. *In re Estate of Bergau,* 103 Wn.2d 431, 435, 693 P.2d 703 (1985); *In re Estate of Riemcke,* 80 Wn.2d 722, 728, 497 P.2d 1319 (1972); RCW 11.12.230. Such intention must, if possible, be ascertained from the language of the will itself, and the will must be considered in its entirety and effect must be given every part thereof. *Bergau,* 103 Wn.2d at 435. Although a will speaks as of the date of death, the testator's intentions, when viewed in the light of the surrounding circumstances and language, are determined as of the time of the will's execution. *In re Estate of Robinson,* 46 Wn.2d 298, 300, 280 P.2d 676 (1955).

As stated in *Bergau,* 103 Wn.2d at 436:

> When upon a reading of the will in its entirety any uncertainty arises as to the testator's true intention, it is well accepted that extrinsic facts and circumstances may be admitted for the purpose of explaining the language of the will. *In re Estate of Riemcke, supra; In re Estate of Torando,* 38 Wn.2d 642, 228 P.2d 142, 236 P.2d 552 (1951). When there is an ambiguity in a will, the testimony of the drafter may be admitted to assist in resolving the problem. *In re Estate of Torando, supra.*

Clearly an ambiguity or uncertainty arises from E. J. Mell's choice of language in his will. The ambiguity stems from the testator's use of "separate" and "community" property labels in the distribution scheme. As we have noted, presuming that all property owned by the testator on the date of his death was "separate property" as that term was used in the will and that the testator knew that such would be the case if Mary Mell predeceased him, the court decreed that all property goes to Arthur J. Mell. We disagree.

The trial court erred in its basic premise that all property owned by E. J. Mell on the date of his death would be "separate property" as that term was used in the will. If the court's basic premise is incorrect, then its use of the pre-

sumption that E. J. Mell knew this to be the law and therefore intended that result also must fall. Language in some of our reported cases appears to support the proposition that, on death of one spouse the community is dissolved and the former community property "becomes the separate property of the decedent's estate and of the surviving spouse." *DeNoskoff v. Scott,* 36 Wn. App. 424, 427, 674 P.2d 687 (1984). "The property, in reality, becomes 'plainly separate.'" *Edmonds v. Ashe,* 13 Wn. App. 690, 695, 537 P.2d 812 (1975). *See also In re Estate of McHugh,* 165 Wash. 123, 4 P.2d 834 (1931); *Crawford v. Morris,* 92 Wash. 288, 158 P. 957 (1916).

▮ However, as noted in *Edmonds v. Ashe,* 13 Wn. App. at 695: "References to community property existing after the death of a spouse are made merely as an aid to administration." So too are descriptions of property after death of a spouse as "plainly separate" made merely to aid in administration; such characterizations have importance only because of the preexisting marriage. What is meant by such descriptions, and what technically is correct, is that such former community property, upon dissolution of the marital community, becomes "individually owned" property. As stated in *James v. James,* 51 Wash. 60, 62, 97 P. 1113, 98 P. 1115 (1908), quoting from *Ambrose v. Moore,* 46 Wash. 463, 465–66, 90 P. 588 (1907):

> Where no disposition of the property rights of the parties is made by the divorce court, the separate property of the husband prior to the divorce becomes his *individual property* after divorce, the separate property of the wife becomes her *individual property,* and from the necessities of the case, their joint or community property must become common property. After the divorce there is no community, and in the nature of things there can be no community property.

(Italics ours.) As stated another way in *Bortle v. Osborne,* 155 Wash. 585, 595–96, 285 P. 425, 67 A.L.R. 1152 (1930),

> The community was dissolved by the death of the husband. There can be no community property after the community has been dissolved. All rights and incidents

of an existing community relationship cease the instant one of the spouses dies. By a fiction of law the community is deemed to continue for liquidation of the estate.

"Moreover the community no longer exists after the death of one of the spouses, but its estate is simply held intact by administrative proceedings for the purpose of paying indebtedness created during its existence. The entity called the 'community,' is immediately dissolved upon the death of one of its members, and is in law as effectually dead as a deceased individual." *Bank of Montreal v. Buchanan,* 32 Wash. 480, 73 Pac. 482.

Finally, as noted in *In re Estate of Morgan,* 203 Cal. 569, 265 P. 241 (1928), at page 577:

It might have been, in a sense, the separate property of Annie Morgan at the time of her death, and still have been the community property of herself and husband during their marriage, although strictly *speaking, the term "separate property" only applies to property owned by a married person in his or her own right during marriage.* After the dissolution of the marriage by death, the survivor does not hold the property, which was formerly community property, as community property. It is succeeded to as his or her property *without being characterized as either separate or community property.*

(Citations omitted. Italics ours.)

Thus we conclude that, if E. J. Mell is presumed to have known the law as it existed at the time he drew his will, it is presumed he knew that he would own no "separate property" as such, if his wife were to predecease him. This leads to the conclusion that E. J. Mell was referring only to that property which he had acquired prior to his marriage to Mary when he described it as "separate property"; that his true intention was to leave only that previously owned property to his son Arthur J. Mell. Consequently, his interest in the property subjected to administration in the estate of Mary Mell—which he classified as "community property"—would be distributed to his residuary beneficiaries.

Ordinarily we would remand to the trial court for its consideration and evaluation of the residuary legatees' extrinsic evidence of the testator's intent. However, if the

trial judge finds that evidence convincing, the residuary legatees prevail. On the other hand, if the court finds the evidence not convincing, the residuary legatees still prevail because of the unrebutted presumption that E. J. Mell knew the law and intended them to benefit. Thus, in the peculiar circumstances, a remand for such purpose would be a disservice to all concerned and fruitless.

Accordingly, the trial court is reversed, the judgment and decree declaring status of property and construing will of February 24, 1983, is vacated, and the cause is remanded for further proceedings consistent herewith.

WORSWICK, C.J., and ALEXANDER, J., concur.

After modification, further reconsideration denied May 29, 1985.

Review granted by Supreme Court September 19, 1985.